NATURAL RESOURCES DEFENSE COUNCIL, INC., Petitioner,

v.

William K. REILLY, Administrator, Environmental Protection Agency and Environmental Protection Agency, Respondents,

Nuclear Management and Resources Council, Inc., American Mining Congress, Intervenors.

No. 91–1294.

United States Court of Appeals, District of Columbia Circuit.

Argued April 3, 1992.

Decided Sept. 25, 1992.

Graeme W. Bush, with whom Julia L. Porter and David D. Doniger, Washington, D.C., were on the brief, for petitioner.

Alice L. Mattice, Atty., U.S. Dept. of Justice, with whom Barry M. Hartman, Acting Deputy Asst. Atty. Gen., and Timothy D. Backstrom, Counsel, Environmental Protection Agency ("EPA"), Washington, D.C., were on the brief, for respondents. David W. Zugschwerdt, Atty., Dept. of Justice, Washington, D.C., also entered an appearance for respondents.

Anthony J. Thompson (for American Min. Congress), Jay E. Silberg, Mindy A. Buren, Margaret S. Spencer, and Robert W. Bishop (for Nuclear Management and Resources Council, Inc.), Washington, D.C., were on the joint brief for intervenors.

Before SILBERMAN, BUCKLEY, and SENTELLE, Circuit Judges.

Opinion for the court filed by Circuit Judge BUCKLEY.

Concurring opinion filed by Circuit Judge SILBERMAN.

BUCKLEY, Circuit Judge:

For well over a decade, the Environmental Protection Agency has grappled with the question of whether to regulate the emission into the air of radioactive particles from facilities licensed by the Nuclear Regulatory Commission. Although the Clean Air Act established stringent deadlines for the issuance of emission standards regulating radioactive pollutants found to endanger the public health, and although the Agency made such a determination in 1979, it did not promulgate final emission standards until 1989. But as a result of successive stays to enable it to reconsider comments and to examine additional data, the EPA has yet to apply the standards to facilities, other than nuclear power reactors, that have been licensed by the Nuclear Regulatory Commission.

The Natural Resources Defense Council challenges the latest of these stays, arguing that it is barred by the 1990 Amendments to the Clean Air Act and that the Agency has no general authority to suspend the standards. We agree.

## I. BACKGROUND

### A. The Clean Air Act

In the 1977 amendments to the Clean Air Act, ("CAA" or "Act"), Pub.L. No. 95–95, 91 Stat. 685 (1977), Congress ordered the Administrator of the EPA to review data "and determine whether or not emissions of radioactive pollutants ... into the ambient air will cause, or contribute to, air pollution which may reasonably be anticipated to endanger public health." CAA § 122(a), 42 U.S.C. § 7422(a) (1988). If he determines that any does, the Administrator must include it in a list of hazardous air pollutants. *Id.* Then,

[w]ithin 180 days after the inclusion of any air pollutant in such list, the Administrator shall publish proposed regulations establishing emission standards for such pollutant together with a notice of a public hearing within thirty days. Not later than 180 days after such publication, the Administrator shall prescribe an emission standard for such pollutant, unless he finds, on the basis of information presented at such hearings, that such pollutant clearly is not a hazardous air pollutant.

CAA § 112(b)(1)(B), 42 U.S.C. § 7412(b)(1)(B) (1988).

The EPA took the first step in this regulatory process in late 1979, adding radionuclides (atoms that "spontaneously undergo[ ] radioactive decay," 40 C.F.R. § 61.-101(f) (1991)) to the list of hazardous air pollutants. The Agency found in its listing decision that "exposure to radionuclides increases the risk of human cancer and genetic damage." 44 Fed.Reg. 76,738 (1979). Accordingly, it "concluded that emission of radionuclides may reasonably be anticipated to endanger public health, and that radionuclides constitute hazardous air pollutants within the meaning of the Clean Air Act." *Id.*

As indicated above, the Act required the EPA to publish proposed emission standards for radionuclides within 180 days. The Agency allowed this deadline to lapse without acting. In the resulting litigation, the United States District Court for the Northern District of California found that the Administrator had a non-discretionary duty to promulgate proposed standards and gave the Agency 180 more days within which to do so. *See Sierra Club v. Gorsuch,* 551 F.Supp. 785–89 (N.D.Cal.1982). The EPA issued proposed standards on April 6, 1983. *See* 48 Fed.Reg. 15,076 (1983).

Under the Act, the promulgation of these standards triggered another 180–day deadline for the issuance of either final emission standards or of a finding that the pollutant "clearly is not a hazardous air pollutant." CAA § 112(b)(1)(B), 42 U.S.C. § 7412(b)(1)(B). The Agency did not meet this deadline, and the federal court in California ordered the EPA to promulgate final standards for radionuclides within ninety days. *See Sierra Club v. Ruckelshaus,*

602 F.Supp. 892–900 (N.D.Cal.1984). After the expiration of that deadline, the court found the Administrator in contempt for failing to issue the standards and gave the Agency 120 more days to comply with the statute. *Id.* at 900–04. The EPA issued final emission standards for most sources on February 6, 1985. *See* 50 Fed.Reg. 5,190 (1985).

The final standards became the subject of litigation in this court. While several petitions for review were pending, the EPA sought a voluntary remand of the standards for reconsideration in light of our decision in *NRDC v. EPA*, 824 F.2d 1146 (D.C.Cir.1987) (*en banc*). We granted this request but established a schedule for re-promulgation, giving the EPA a total of 360 days to issue final standards.

Two years later, the Agency published new final emission standards for radionuclides. The Agency again found that radionuclides represent hazardous pollutants, noting that

> [t]he evidence that radionuclides can cause cancer has, if anything, increased since 1979. The evidence now suggests that the risks from radiation exposure are higher than was believed at that time.... EPA has determined that radionuclides not only pose a risk of carcinogenicity and mutagenicity when emitted into the air but also are emitted in sufficient quantities as to create a risk warranting listing under section 112.

54 Fed.Reg. 51,654, 51,663 (1989) (citations omitted). The standards established maximum permissible exposure levels and imposed reporting requirements to ensure compliance. *Id.* at 51,663–68; 51,694–704.

At the same time, however, the Agency stayed the implementation of the standards for a variety of facilities, including those licensed by the Nuclear Regulatory Commission ("NRC") or by an Agreement State (collectively, "NRC–licensed facilities"). *See id.* at 51,668. The EPA explained that it had received comments from federal agencies at the end of the notice-and-comment period raising concerns that the new standards would both duplicate and clash with existing NRC regulations and impose unnecessary burdens on the regulated communities. It was also feared that the standards would discourage the use of radioactive materials at medical facilities. 54 Fed. Reg. at 51,667–68. "[I]n recognition of the serious nature of these concerns, and the need to further investigate and resolve these matters, EPA has concluded that it should treat the comments and information filed by [the National Institute of Health] and NRC as petitions for reconsideration of the standard...." *Id.* at 51,668. Petitions for reconsideration filed pursuant to section 307 of the Clean Air Act allow the EPA to delay the implementation of regulations for three months, and the Agency availed itself of this leeway. *Id.; see also* CAA § 307(d)(7)(B), 42 U.S.C. § 7607(d)(7)(B) (1988).

Since the expiration of this three-month stay, the Agency has stayed the final standards for NRC-licensed facilities three additional times. *See* 55 Fed.Reg. 10,455–56 (1990) (120 days from March 15, 1990); *id.* at 29,205–06 (60 additional days); *id.* at 38,057–58 (180 more days). The EPA found authority for these stays in section 10(d) of the Administrative Procedure Act, 5 U.S.C. § 705(d) (1988), and section 301 of the CAA, 42 U.S.C. § 7601(a). According to the Agency, the stays also represented a continuation of the reconsideration process initiated at the time it promulgated the final standards.

### B. The 1990 Amendments

During the pendency of the final stay, Congress passed, and the President signed, the Clean Air Act Amendments of 1990, Pub.L. No. 101–549, 104 Stat. 2399 (1990). The Amendments added section 112(d)(9) to the Act, which provides:

> No standard for radionuclide emissions from any category or subcategory of facilities licensed by the Nuclear Regulatory Commission (or an Agreement State) is required to be promulgated under this section if the Administrator determines, by rule, and after consultation with the Nuclear Regulatory Commission, that the regulatory program established by the Nuclear Regulatory Commission ...

for such category or subcategory provides an ample margin of safety to protect the public health.

42 U.S.C.A. § 7412(d)(9) (West Supp.1992). The 1990 Amendments, however, specifically stayed the effectiveness of the radionuclide emission standards for medical facilities:

Notwithstanding paragraph (1) [set out below], no standard promulgated under this section prior to November 15, 1990 with respect to medical research or treatment facilities shall take effect for two years following November 15, 1990 unless the Administrator makes a determination pursuant to a rulemaking under section 7412(d)(9) of this title. If the Administrator determines that the regulatory program established by the Nuclear Regulatory Commission for such facilities does not provide an ample margin of safety to protect public health, the requirements of section 7412 of this title shall fully apply to such facilities.

CAA § 112(q)(4), 42 U.S.C.A. § 7412(q)(4). Paragraph (1) of subsection (q), referred to above, states that emission standards that had been promulgated prior to the passage of the 1990 Amendments and had not taken effect would not be affected by the new statute:

Except as provided in paragraph (4), any standard under this section which has been promulgated, but has not taken effect, before [the date of enactment of the 1990 Amendments] shall not be affected by [the Amendments] unless modified as provided in this section before [the date of enactment] or under [the Amendments].... If a timely petition for review of any such standard ... is pending on [the] date of enactment, the standard shall be upheld if it complies with this section as in effect before that date.

CAA § 112(q)(1), 42 U.S.C.A. § 7412(q)(1).

The EPA imposed the stay under review on April 24, 1991. Pursuant to section 112(d)(9) of the Act, the Agency examined all information pertinent to radionuclide emissions from NRC-licensed facilities and the effectiveness of the NRC's efforts to control their emission. *See* 56 Fed.Reg.

18,735 (1991). It concluded "that it is probable that many, if not all, of the categories of NRC-licensed facilities other than nuclear power reactors are in compliance with the [radionuclide] emission requirements...." *Id.* Nevertheless, because there were over 12,000 such facilities, and because those facilities' emissions "are not well characterized for purposes of determining compliance with [the emission requirements,]" the EPA found that it "did not have sufficient substantive information to support the determination contemplated by section 112(d)(9) for any category of NRC-licensed facilities other than nuclear power reactors." *Id.*

Thus, after a full notice-and-comment rulemaking, including a hearing, the EPA determined to stay the effectiveness of the emissions standards so it could compile additional data. The Agency felt that "it would be inappropriate to compel NRC-licensed facilities other than nuclear power reactors to make all of the initial expenditures of time and resources" to comply with the emission standards "when it is possible that EPA will conclude that EPA regulation of some or all of these facilities is duplicative and unnecessary." *Id.* at 18,-736.

The Agency grounded its authority to issue this stay in section 112(d)(9), which, the EPA averred, "do[es] not clearly establish all of the procedures to be followed" in applying that section to previously enacted emission standards. *Id.* at 18,737. The Agency said that it was "unwilling to ascribe to Congress an intention to require to prepare for compliance with [the emission standards] even though it is probable that EPA will subsequently be able to make a determination for at least some of these facilities that such expenditures are not required to protect public health." *Id.* Moreover, the Agency reasoned, "applicable legal precedents indicate that an agency may always stay by rulemaking under the Administrative Procedure Act a previously promulgated rule, so long as the stay is otherwise in accord with applicable law." *Id.* This last ground, however, was not urged on appeal.

## II. Discussion

Under the Clean Air Act, this court must uphold the EPA's promulgation or revision of any emission standards under section 112 unless it is "(A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; [or] ... (C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right[.]" CAA § 307(d)(9), 42 U.S.C. § 7607(d)(9) (1988); *see also id.* § 307(d)(1)(C), 42 U.S.C. § 7607(d)(1)(C). The Natural Resources Defense Council, Inc. ("NRDC") seeks review of the EPA's most recent stay, claiming that the Agency lacked the necessary authority. On appeal, the EPA relies exclusively on the Act for its authority to suspend the standards.

The only question before us is whether the EPA has the authority to stay the effect of the radionuclides emission standards. The NRDC notes that section 112 of the Clean Air Act, as it existed before the 1990 Amendments, set very specific deadlines on the promulgation of final emission standards. It permitted a stay only under carefully defined circumstances; and even then, it did so for a single period not to exceed three months. *See* CAA § 307(d)(7)(B), 42 U.S.C. § 7607(d)(7)(B).

The NRDC contends that the 1990 Amendments did not change this scheme; nor did they give the EPA new authority to suspend emission standards for hazardous air pollutants. Section 112(q)(4) stayed the effect of the radionuclide standards for medical facilities; section 112(d)(9) arguably authorizes an exemption for other NRC facilities if the EPA determines, through a rulemaking, "that the regulatory program established by the Nuclear Regulatory Commission ... for such category or subcategory provides an ample margin of safety to protect the public health." CAA § 112(d)(9), 42 U.S.C.A. § 7412(d)(9) (West Supp.1992). The NRDC notes, however, that the EPA has not made such findings for facilities other than nuclear power plants and argues that the statute therefore requires that the emission standards take effect.

In its rulemaking, the EPA relied on the 1990 Amendments as the basis for its stay. *See* 56 Fed.Reg. at 18,737. According to the Agency, while the Amendments directed it to reconsider the regulation of radionuclide emissions from NRC-licensed facilities, they failed to specify the rules that would apply while this reconsideration took place. The EPA claims the authority "to fashion a reasonable transitional regime for implementing the intent of [the Amendments]." Brief for Respondents at 21.

The EPA maintains that reading the statute in any other way would force it to impose a burdensome regulatory structure on licensees when the results of its additional study might lead to a finding that the existing NRC regulations provide an ample margin of safety. The Agency contends that the other provisions of the 1990 Amendments do not compel a different result, and that the Amendments do not alter the Administrator's general authority to "prescribe such regulations as are necessary to carry out his functions under this chapter," citing section 301(a)(1) of the Act, 42 U.S.C. § 7601(a)(1) (1988). This, the Agency argues, includes the power to stay regulations already promulgated.

■ The EPA asserts that its interpretation of the statute is entitled to deference under *Chevron U.S.A. Inc. v. NRDC,* 467 U.S. 837, 842–45, 104 S.Ct. 2778, 2781–83, 81 L.Ed.2d 694 (1984). Under the *Chevron* doctrine, an agency's interpretation of a statute entrusted to its administration is entitled to deference only if the statute "is silent or ambiguous on the matter at issue, and if its interpretation is reasonable and consistent with the statutory purpose." *See, e.g., Hazardous Waste Treatment Council v. Reilly,* 938 F.2d 1390, 1395 (D.C.Cir.1991); *Chemical Mfrs. Ass'n v. EPA,* 919 F.2d 158, 162–63 (D.C.Cir.1990). We find that both the language and the purpose of the Act and the 1990 Amendments preclude the authority claimed by the EPA to stay the effectiveness of the standards.

■ The EPA does not contend, nor can it, that the 1990 Amendments give the Administrator the specific power to suspend

already promulgated emission standards. Section 112(q)(4) stays the effect of the radionuclide emission standards for medical facilities only. This stay, which is ordered by Congress, cannot be read to imply an authority in the EPA to suspend the application of the standard to other licensees— let alone a general power to stay previously promulgated standards.

■ In addition, the EPA suggests that section 301's broad grant of regulatory authority allows for a stay of any regulation issued by the Agency. Before the enactment of the 1990 Amendments, however, the Clean Air Act mandated a highly circumscribed schedule for the promulgation of regulations establishing air pollution standards. *See* CAA § 112(b), 42 U.S.C. § 7412(b) (1988). In the face of such a clear statutory command, we cannot conclude that section 301 provided the EPA with the authority to stay regulations that were subject to the deadlines established by section 112(b).

In the past, we have not allowed the general grant of rulemaking power embodied in section 301 to trump the specific provisions of the Act. Thus, in *Sierra Club v. EPA,* 719 F.2d 436, 452–53 (D.C.Cir.1983), *cert. denied,* 468 U.S. 1204, 104 S.Ct. 3571, 82 L.Ed.2d 870 (1984), we rejected the EPA's effort to use section 301 as justification for adding a new factor to a list of exceptions under the Act because the "EPA's construction of the statute is condemned by the general rule that when a statute lists several specific exceptions to the general purpose, others should not be implied." Similarly, in *Alabama Power Co. v. Costle,* 636 F.2d 323, 403 (D.C.Cir. 1979), we found that section 301 did not empower the EPA to extend its authority to review modifications of industrial facilities beyond the limits established by Congress in the Act. *Compare ASG Industries, Inc. v. Consumer Product Safety Comm'n,* 593 F.2d 1323, 1334–35 and nn. 48–49 (D.C.Cir.) (agency may defer effective date of regulation where statute included implementation schedule but specifically empowered delay of regulation's effective date upon showing of good cause),

*cert. denied,* 444 U.S. 864, 100 S.Ct. 133, 62 L.Ed.2d 87 (1979). Consistent with our past decisions, we decline to read such open-ended power into section 301.

Our concurring colleague agrees with us that prior to the enactment of the 1990 Amendments, the EPA had no authority to stay the effectiveness of a promulgated standard except for the single, three-month period authorized by section 307(d)(7)(B) of the CAA, 42 U.S.C. § 7607(d)(7)(B). Unlike Judge Silberman, we find the 1990 Amendments equally unambiguous. They command the EPA to give effect to any previously promulgated radionuclide emission standard that has not been "modified as provided in this section." CAA § 112(q)(1), 42 U.S.C. § 4712(q)(1). While the phrase "modified as provided in this section" may be imprecise, the EPA does not claim that any of the standards has been modified. That being the case, the Agency is under a clear obligation to give them effect.

### III. CONCLUSION

Because the EPA did not possess the authority to stay emission standards prior to the passage of the 1990 Amendments, and because the Amendments do not empower the EPA to suspend the application of the radionuclide standards, we grant the petition for review and vacate the stay.

*So ordered.*

SILBERMAN, Circuit Judge, concurring:

I agree with my colleagues that the petition for review should be granted because the EPA's construction of the 1990 Clean Air Amendments is not acceptable. But I do not agree that Congress directly addressed the precise issue presented. The language of the relevant provisions is, at least in part, ambiguous, which requires us to proceed to *Chevron*'s second step and ask whether the agency's construction is a permissible or reasonable one. *Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 843, 104 S.Ct. 2778, 2782, 81 L.Ed.2d 694 (1984). It is sometimes thought that *Chevron* really imposes only a one step analysis—that if the statutory language is ambiguous, affir-

mance of the agency's interpretation is a foregone conclusion. I believe that notion misreads the "plain language" of the *Chevron* opinion (if I may be pardoned the pun), *Chevron,* 467 U.S. at 842–43, 104 S.Ct. at 2781–82; which has troublesome consequences. Judges who accept that premise explicitly or implicitly can be led to find clarity in an ambiguous statute in order to avoid *Chevron*'s second step. To be sure, there are relatively few cases in which a reviewing court has held an agency's interpretation of ambiguous language unreasonable, *see, e.g., Public Employees Retirement Sys. v. Betts,* 492 U.S. 158, 171, 175, 109 S.Ct. 2854, 2863, 2865, 106 L.Ed.2d 134 (1989); *Abbott Laboratories v. Young,* 920 F.2d 984, 988 (D.C.Cir.1990), *cert. denied,* 112 S.Ct. 76 (1991); but that is all the more reason, in my view, to be careful in identifying those cases when they arise. This is such a case.

As the majority opinion ably demonstrates, prior to the 1990 Clean Air Amendments it was exceedingly doubtful whether the EPA had the authority to "stay" a proposed regulation establishing emission standards. With that backdrop, Congress, in the 1990 Amendments, focused on the general problem of the regulation of radionuclide emissions by *both* the Nuclear Regulatory Commission, which licenses nuclear facilities, and the EPA.

Section 112(d)(9) looks to the future and sets forth the procedure and standards the EPA Administrator must use in determining whether to promulgate new regulations for facilities regulated by the NRC:

> No standard for radionuclide emissions from any category or subcategory of facilities licensed by the Nuclear Regulatory Commission (or an Agreement State) is required to be promulgated under this section if the Administrator determines, by rule, and after consultation with the Nuclear Regulatory Commission, that the regulatory program established by the Nuclear Regulatory Commission pursuant to the Atomic Energy Act [42 U.S.C.A. § 2011 et seq.] for such category or subcategory provides an ample margin of safety to protect the public health. Nothing in this subsection shall

preclude or deny the right of any State or political subdivision thereof to adopt or enforce any standard or limitation respecting emissions of radionuclides which is more stringent than the standard or limitation in effect under section 7411 of this title or this section.

42 U.S.C. § 7412(d)(9) (West Supp.1992). If the Administrator is inclined to defer to the NRC's regulations, § 112(d)(9) obliges him to proceed by rule to allow interested parties to comment. That provision also requires him to assume the responsibility of making formally the sobering determination that the NRC's regulation promises an *"ample"* margin of safety to protect the public health.

Section 112(q), on the other hand, entitled "Savings provision," is directed to past EPA regulatory proceedings. Paragraph (4) of that section is specifically directed to medical facilities:

> [N]o standard promulgated under this section prior to November 15, 1990 with respect to medical research or treatment facilities shall take effect for two years following November 15, 1990, unless the Administrator makes a determination pursuant to a rulemaking under section 7412(d)(9) of this title. If the Administrator determines that the regulatory program established by the Nuclear Regulatory Commission for such facilities does not provide an ample margin of safety to protect public health, the requirements of section 7412 of this title shall fully apply to such facilities. If the Administrator determines that such regulatory program does provide an ample margin of safety to protect the public health, the Administrator is not required to promulgate a standard under this section for such facilities, as provided in section 7412(d)(9) of this title.

42 U.S.C. § 7412(q)(4) (West Supp.1992). As is apparent, Congress was so concerned about the dual regulation of medical facilities that it imposed a two-year stay *itself* on the EPA's regulations covering those facilities that had been promulgated, but were not yet effective. If the Administrator determined by rule that the NRC regu-

lations provided an "ample margin of safety," EPA's standards would never become effective. In the meantime (but not to exceed two years), while the Administrator was pondering that question, Congress mandated a stay on the promulgated regulations. The EPA, in effect, wishes to extend similar treatment to non-medical facilities.

The majority concludes that application of the common sense maxim of statutory construction *expressio unius est exclusio alterius* indicates that the EPA Administrator did not have authority to impose a stay on promulgated, but not yet effective, regulations applying to anything *other* than medical facilities. Although I favor the maxim as an aid to statutory construction, *see Michigan Citizens for an Indep. Press v. Thornburgh*, 868 F.2d 1285, 1292–93 (D.C.Cir.1989), *aff'd by an equally divided court*, 493 U.S. 38, 110 S.Ct. 398, 107 L.Ed.2d 277 (1989) (per curiam), I think my colleagues stretch it a bit too far here. Paragraph (4) does not speak about the Administrator's *discretion* to grant a stay. If it did, the majority would be on firmer ground. Instead, it refers to a stay mandated by Congress for medical facilities, and, therefore, does not preclude clearly the Administrator from exercising his discretion to grant a stay regarding other facilities. That is not to say paragraph (4) is irrelevant; it is only to say that it is not dispositive. *See*, Silberman, Chevron—*The Intersection of Law & Policy*, 58 Geo. Wash.L.Rev. 821, 827 (1990) ("Of course the Step I analysis informs a court's approach to the second step").

Furthermore, paragraph (1) of that section directly addresses regulations promulgated (but not yet effective) *other* than those directed at medical facilities:

Any standard under this section in effect before the date of enactment of the Clean Air Act Amendments of 1990 shall remain in force and effect after such date unless modified as provided in this section before the date of enactment of such Amendments or under such Amendments. *Except as provided in paragraph (4), any standard under this section which has been promulgated, but has not taken effect, before such date shall not be affected by such Amendments unless modified as provided in this section before such date or under such Amendments.*

42 U.S.C. § 7412(q)(1) (West Supp.1992) (emphasis added).

Congress, by using the emphasized words, certainly would appear to have addressed specifically the regulations which are at issue in this case. The difficulty arises because of the ambiguity of the phrase: "unless modified as provided in this section." That language could not refer to paragraph (4) dealing with medical facilities, because the sentence starts with the phrase "except as provided in paragraph (4)." In other words, the emphasized sentence would appear to contemplate that promulgated, but not yet effective, standards (other than those applying to medical facilities), could be modified pursuant to another subsection of § 112.[1]

The only other subsection of § 112 that either petitioner or respondent point to as arguably relevant is subsection (d)(9). But that subsection speaks only to the Administrator's authority *before* promulgation, so facially it appears inapplicable. The ambiguity thus created is whether or not a promulgated regulation can be stayed pursuant to subsection (d)(9).[2] Petitioner assumes *arguendo* that the EPA can use that subsection for that purpose, but only if it follows the procedures the Administrator would use if he did not wish to promulgate the regulation in the first place. Thus, according to petitioner, the Administrator

---

**1.** I do not understand the majority's statement, that while § 112(q)(1)'s "modified as provided in this section" is "imprecise, the EPA does not claim that any of the standards has been modified." Maj.Op. at 41. The agency argues that it has *the right* to modify a standard by using the procedures defined in other provisions of § 112—particularly subsection 112(d)(9)—and

that the authority to stay the promulgated regulation is such a "modification."

**2.** The EPA does not point to any legislative history which shows that Congress intended to grant this authority free from the requirements of rulemaking.

must proceed by rulemaking to grant a stay, and he must determine before issuing a stay that the regulatory program established by the NRC provides an ample margin of safety for the public.

The EPA, on the other hand, would use the ambiguity to reshape subsection (d)(9) to allow the agency to grant a stay without adopting a rule and without making the determination called for in that subsection. I think that interpretation is flatly unreasonable. It fails the second step of *Chevron* because the agency seeks to exploit the ambiguity rather than to resolve it, and to advance its own policy objectives rather than Congress'.

The agency's interpretation does not fit within the statute's structure. If the agency were authorized to use subsection (d)(9) to stay regulations already promulgated, but not yet effective (which I think is a reasonable although not obvious interpretation), it is implausible to claim that the Administrator is not obliged to make the same determination as to public safety (by rule) that he would be required to make *before* promulgation. The Administrator must take subsection (d)(9) as he finds it, not as he would refashion it.

The EPA argues that its interpretation is justified because rulemaking imposes no compliance costs in the pre-promulgation period. In the post-promulgation period, by contrast, stay authority is needed to prevent unnecessary regulations from forcing higher compliance costs during the rulemaking process. The EPA's argument, although it may reflect sound policy, is not well-grounded in the legislation. The statutory language focuses on providing the public with an ample margin of safety, not on avoiding double regulation. While Congress did not insist on dual regulation, the language it chose makes it rather obvious that it preferred to risk overregulation rather than underregulation.

The only exception to that general policy is embodied in paragraph (4), where Congress limited the mandatory stay it imposed to two years. During that time the Administrator must make the public safety determination—and the determination again must be made by rule. It seems to me quite anomalous to argue that Congress intended to authorize the Administrator to issue stays of other promulgated regulations without the openness of rulemaking, without making a determination of public safety, and with no apparent limit to the stay.

In sum, I believe that a careful reading of the statute, allowing for its ambiguities, reveals that the EPA's interpretation is unreasonable.