**AMERICAN PETROLEUM INSTITUTE and National Petroleum Refiners Association, Petitioners,**

v.

**UNITED STATES ENVIRONMENTAL PROTECTION AGENCY and Carol M. Browner, Administrator, United States Environmental Protection Agency, Respondents,**

**Renewable Fuels Association, Intervenor.**

Nos. 94–1502, 94–1540, 94–1590 and 94–1654.

United States Court of Appeals, District of Columbia Circuit.

Argued Feb. 16, 1995.

Decided April 28, 1995.

Michael F. McBride argued the cause for petitioners American Petroleum Institute and National Petroleum Refiners Ass'n. With him on briefs were David T. Deal,

George W. Frick, John E. Reese, and Maurice H. McBride.

James W. Moorman argued the cause for petitioner American Methanol Institute. With him on brief was Jonathan R. Stone and Frederick R. Anderson.

Gerard R. McConnell filed the brief for petitioner Oxygenated Fuels Ass'n, Inc.

Mary E. Ward and Timothy Burns, U.S. Dept. of Justice, argued the cause for respondents. With them on brief were Lois J. Schiffer, Asst. Atty. Gen., U.S. Dept. of Justice, Alan W. Eckert, Associate Gen. Counsel, and John T. Hannon, U.S. E.P.A.

On joint brief for intervenors Renewable Fuels Ass'n and Corn Refiners Ass'n were Barry B. Direnfeld, Robert S. Taylor, Robert V. Zener, Michael E. Ward, Stephen L. Urbanczyk, and Eric M. Braun.

On joint brief for amici curiae American Farm Bureau Federation, et al. were John J. Rademacher, James D. Keast, and Jeff Masten.

Elaine Lubin filed the brief for amicus curiae Citizen Action.

L. Steven Grasz filed the brief for amicus curiae Governors' Ethanol Coalition.

Before WILLIAMS, SENTELLE, and RANDOLPH, Circuit Judges.

Opinion for the Court filed by Circuit Judge SENTELLE.

SENTELLE, Circuit Judge:

The American Methanol Institute, the American Petroleum Institute, the National Petroleum Refiners Association, and the Oxygenated Fuels Association, Inc. (hereinafter "petitioners") challenge the promulgation by the Environmental Protection Agency ("EPA") of a renewable oxygenate requirement in its regulations for the reformulated gasoline program under the Clean Air Act. Upon review, we agree with petitioners that EPA lacked the authority to promulgate such a requirement.

## I. BACKGROUND

In 1990, Congress established the reformulated gasoline program ("RFG") in section 211(k), 42 U.S.C. § 7545(k), of the Clean Air Act ("CAA"), 42 U.S.C. § 7401 et seq. (1988 & Supp. V 1993), and directed EPA to "promulgate regulations under this section establishing requirements for reformulated gasoline to be used in gasoline-fueled vehicles in specified nonattainment areas." 42 U.S.C. § 7545(k)(1). The section further provided that the regulations "shall require the greatest reduction in emissions of ozone forming volatile organic compounds (during the high ozone season) and emissions of toxic air pollutants (during the entire year) achievable through the reformulation of conventional gasoline, taking into consideration the cost of achieving such emission reductions, any nonair-quality and other air-quality related health and environmental impacts and energy requirements." Id. Congress also required that RFG be at least two percent oxygen by weight, not more than one percent benzene by volume, and contain no heavy metals. 42 U.S.C. § 7545(k)(2).

The primary oxygenates added to RFG to make it at least two percent oxygen by weight are ethanol and methyl tertiary butyl ether ("MTBE"). Ethanol, primarily made from corn, is considered renewable since corn can be regrown year after year. By contrast, MTBE is derived primarily from nonrenewable resources such as natural gas and petroleum. A renewable oxygenate that is not yet in common use is ethyl tertiary butyl ether ("ETBE"), which is derived from ethanol.

During the comment period for the RFG program, supporters of ethanol had argued that the volatile organic compound ("VOC") emission standards in the program, 42 U.S.C. § 7545(k)(3)(B)(i), would preclude the use of ethanol in RFG because adding ethanol to gasoline increases its volatility and raises VOC emissions, especially in the summertime. By contrast, the use of MTBE as an oxygenate does not boost a fuel's volatility. In February 1994, EPA promulgated a set of final regulations implementing the RFG program. Regulation of Fuels and Fuel Additives: Standards for Reformulated and Conventional Gasoline, 59 Fed.Reg. 7,716 (1994). Around that time, EPA also proposed another rule requiring that thirty percent of the

oxygen required to be used in RFG come from renewable oxygenates. Regulation of Fuels and Fuel Additives: Renewable Oxygenate Requirement for Reformulated Gasoline, 58 Fed.Reg. 68,343 (proposed Dec. 27, 1993).

In August 1994, EPA issued a final renewable oxygenate rule ("ROR") for RFG. Regulation of Fuels and Fuel Additives: Renewable Oxygenate Requirement in Reformulated Gasoline, 59 Fed.Reg. 39,258 (1994). The ROR adopted the proposed requirement that thirty percent of the oxygen in RFG be derived from renewable sources. EPA noted that at the time the ROR was promulgated, the two most common oxygenates were ethanol and MTBE. *Id.* at 39,259. In justification of the rule, EPA stated that the ROR 1) will help conserve fossil energy resources and minimize any detrimental effects the RFG program may have on energy consumption; 2) has the potential to provide global warming benefits by stimulating the market for renewable oxygenates; and 3) will maintain the benefits of the RFG program and increase those benefits through incentives for increased ETBE use in the summer, displacing ethanol use during those months. *Id.* at 39,262.

In the overview of the ROR, EPA observed that through various projects Congress and the Executive Branch have promoted the use of renewable fuels and the development of the renewable fuels industry to enhance domestic energy security, reduce oil imports, conserve fossil energy resources, and reduce emissions of greenhouse gases. *Id.* at 39,261. It also stated that under the oxygenated fuels program of the CAA, 42 U.S.C. § 7545(m), which requires that gasoline sold in certain cities during the winter months contain oxygenates, ethanol had captured approximately thirty percent of the resulting oxygenate market. 59 Fed.Reg. at 39,261. EPA stated that the oxygenate requirements of the RFG program also provided the potential to expand the market for ethanol and other renewable oxygenates, although it noted that the VOC emission performance standards of the RFG program raised the concern that ethanol would be unable to compete due to volatility problems.

Accordingly, EPA determined that ethanol would have to be blended with special reduced-volatility blendstocks in the summer or that it would have to be converted to ETBE in order to meet the RFG program's emission restrictions. *Id.* at 39,262. Nevertheless, EPA set a minimum thirty percent market share for renewable oxygenates, based on the market share ethanol obtained under the oxygenated fuel program for the winter months. *Id.*

EPA stated that ethanol is likely to be the dominant renewable oxygenate used to meet the ROR, especially during the initial years of the program, since it is the only renewable oxygenate produced in large quantities. However, EPA also concluded that ethanol cannot be blended in the summer months to meet the RFG emission requirements so that its use will be concentrated in the winter months. *Id.* at 39,272. Moreover, EPA observed that the production of ETBE, which can be used year round without volatility problems, is expected to be virtually nonexistent in 1995, although it expected its use to increase by 1996 through the conversion of MTBE facilities. *Id.*

Petitioners challenge EPA's promulgation of the ROR, arguing that EPA lacked the statutory authority to impose a mandate to use renewable oxygenates in RFG, that the ROR violates the CAA and undermines VOC emission reductions, that EPA failed to consider the ROR's environmental impacts, and that the ROR is arbitrary and capricious because it interferes with California's RFG program. Specifically, petitioners argue that section 7545(k)(1), which established the RFG program, does not authorize EPA to include a renewable oxygenate mandate in the program. The overriding goal of the RFG program, petitioners assert, is set forth in section 7545(k)(1) as attaining the greatest achievable reduction in VOCs and toxics emissions through the reformulation of conventional gasoline. Because EPA's asserted justification for the ROR, that is, the promotion of renewable oxygenates and related goals, are not the objectives of section 7545(k)(1), petitioners maintain that EPA has impermissibly exceeded its statutory authority. *See Chevron U.S.A. Inc. v. Natural Re-*

*sources Defense Council, Inc.,* 467 U.S. 837, 842–43, 104 S.Ct. 2778, 2781–82, 81 L.Ed.2d 694 (1984).

Petitioners argue that Congress set specific goals and factors for EPA to seek in section 7545(k)(1). Although the section states that RFG regulations should require the greatest achievable reduction in emissions while "taking into consideration the cost of achieving such emission reductions, any nonair-quality and other air-quality related health and environmental impacts and energy requirements," petitioners argue that those considerations are expressly to be "tak[en] into consideration" in determining the greatest VOC and toxics emissions reductions achievable and are not independent goals. They contend that section 7545(k)(1), like other sections of the CAA, does not give EPA broad authority but instead states specific program goals and provides subsidiary provisions that define how the goals are to be achieved. Nothing in the section, petitioners argue, suggests that Congress intended to authorize EPA to reach out to achieve goals beyond the purposes of the section. Petitioners also maintain that there is nothing in the legislative history of this section to support a broad grant of power to EPA.

Moreover, 42 U.S.C. § 7545(c) gives EPA the authority to control or prohibit the manufacture and sale of fuel or fuel additives it believes will contribute to air pollution. 42 U.S.C. § 7545(c)(1). Under this section, the agency must consider all relevant medical and scientific evidence, including other feasible means of achieving emission standards, and also consider available scientific and economic data, including a cost benefit analysis comparing emission control devices that use the prohibited fuel and those that do not. 42 U.S.C. § 7545(c)(2)(A) and (B). EPA must publish a finding that the prohibition will not cause the use of any other fuel or additive that will produce worse emissions than those produced by the prohibited substance. 42 U.S.C. § 7545(c)(2)(C). Petitioners argue that the ROR unavoidably prohibits the use of non-ethanol oxygenates in thirty percent of the RFG market and that EPA failed to follow the requirements of section 7545(c) and did not make the required finding that the prohibition of non-ethanol oxygenates will not cause the use of worse oxygenates. *See American Methyl Corp. v. EPA,* 749 F.2d 826, 834–36 (D.C.Cir.1984) (EPA must use procedures under section 7545(c) to ban a specific gasoline blend already in commerce). Petitioners also contend that section 7545(c) requires an approach that is fuel and technology neutral and that, by mandating the use of ethanol and ETBE, the ROR contradicts this approach.

EPA maintains that the ROR is within its authority because it is designed to ensure that the emissions reduction requirements for RFG are achieved in a way that reasonably "optimize[s] the resulting impacts on cost, energy requirements, and other health and environmental impacts." *See* 59 Fed. Reg. at 39,263. Section 7545(k)(1) provides that EPA shall promulgate regulations establishing requirements for RFG, and the CAA, 42 U.S.C. § 7601(a)(1), delegates to EPA the authority to promulgate such regulations as are necessary for it to carry out its functions under the Act. While section 7601(a)(1) does not give EPA carte blanche authority to promulgate any rule relating to the CAA, EPA maintains that it is sufficiently broad to allow the promulgation of rules that are necessary and reasonable to effect the purposes of the Act.

■ EPA asserts that its interpretation is entitled to deference under *Chevron,* 467 U.S. at 842–45, 104 S.Ct. at 2781–83. Under the *Chevron* doctrine, a court reviewing an agency's interpretation of a statute it administers must first determine whether Congress has directly spoken to the precise question at issue. If the intent of Congress is clear, the review ends there for the court must give effect to the unambiguously expressed intent of Congress. *Id.* at 842–43, 104 S.Ct. at 2781–82. If the court determines that Congress has not directly addressed the precise issue, however, it then goes to the second step of the review to determine whether the agency's interpretation is based on a permissible construction of the statute. *Id.* at 843, 104 S.Ct. at 2781–82. In this second step, the court must accord considerable weight to the agency's construction of the statute and it may not substitute

its own construction of the statute for the agency's reasonable interpretation. *Id.* at 843–44, 104 S.Ct. at 2781–82.

Although petitioners assert that under *Chevron*'s step one analysis EPA has no authority to issue the ROR, EPA responds that the plain language of section 7545(k)(1) contradicts these assertions. It claims that the section's first sentence delegates to EPA the authority to set the requirements for RFG in its regulations and the second sentence does not limit those regulations to implementing emission or other particular standards. Since Congress has erected no clear impediment to the issuance of binding rules, EPA asserts that this section takes it as far as *Chevron*'s second step. *See Natural Resources Defense Council, Inc. v. EPA,* 22 F.3d 1125, 1148· (D.C.Cir.1994) (per curiam). Accordingly, EPA states that its interpretation must be upheld unless it is manifestly contrary to the CAA. *See Chevron,* 467 U.S. at 843–45, 104 S.Ct. at 2781–83.

Section 7545(k)(1) gives EPA the authority to promulgate regulations establishing requirements for RFG, and EPA maintains that the term "requirements" is quite broad as used in the CAA and encompasses things such as performance standards, emission limitations, work practices, and operational standards. For example, EPA notes that in 42 U.S.C. § 7521(a)(3)(D) it is authorized to prescribe requirements to control heavy-duty engine rebuilding practices, including standards applicable to emissions. It further states that 42 U.S.C. § 7602(k) defines emission standard, emission limitation, and design, equipment, work practice or operational standards as certain types of requirements. EPA acknowledges the existence of *Adamo Wrecking Co. v. United States,* 434 U.S. 275, 287–89, 98 S.Ct. 566, 574–75, 54 L.Ed.2d 538 (1978), which held that emission standards·do not include work practice standards under the CAA, and *PPG Industries, Inc. v. Harrison,* 660 F.2d 628, 636 (5th Cir.1981), which stated that the authority to set standards of performance, which could be established only in the·form of emissions limitations, did·not give EPA authority to require use of a certain type of fuel. EPA maintains that these cases are inapposite, however, since they merely differentiate between the terms "emissions standards" and "work practice standards," and EPA has authority to promulgate either type of standard for the RFG program.

Thus, the term "requirements," EPA asserts, does not limit it to promulgation of emission standards, since when Congress wanted to limit EPA's authority it did so expressly. *See, e.g.,* 42 U.S.C. § 7411(b)(1)(B) (regulations establishing federal standards of performance); 42 U.S.C. § 7412(d)(1) (authorizing regulations establishing emission standards). Moreover, EPA states that Congress explicitly limited its authority in another part of section 7545(k). *See* 42 U.S.C. § 7545(k)(3)(B)(i) and (ii) (EPA can "adjust such ... requirement[s] to provide for a lesser or greater reduction based on technological feasibility, considering the cost of achieving such reductions in VOC emissions."). Since section 7545(k)(1) does not contain a similar explicit restraint on the agency's authority, EPA avers that it would be incorrect to infer one. Similarly, because section 7545(k)(1) states that "such regulations" shall meet the specified criteria and does not state that *each* regulation must do so, EPA asserts that it is not limited to promulgating emission reduction standards in accord with the second sentence of the section. Additionally, EPA claims that it is reasonable to conclude that Congress gave it this level of flexibility since the regulation of gasoline to control emissions involves a vast, nationwide network of interconnecting industries, each of which influences the gasoline end-product in distinct ways. *See E.I. du Pont de Nemours & Co. v. Train,* 430 U.S. 112, 133, 97 S.Ct. 965, 977–78, 51 L.Ed.2d 204 (1977) (the Court cannot conclude that "Congress would have failed so conspicuously to provide EPA with the authority needed to achieve the statutory goals."); *Ethyl Corp. v. EPA,* 541 F.2d 1, 24 (D.C.Cir.) (broad construction of environmental statute warranted from the nature of the EPA administrator's charge), *cert. denied,* 426 U.S. 941, 96 S.Ct. 2662, 49 L.Ed.2d 394 (1976).

As for petitioners' argument that EPA was required to adhere to the requirements of section 7545(c) for prohibiting the manufac-

ture of fuel additives, EPA maintains that this argument is barred because petitioners failed to raise it during the period for public comment. 42 U.S.C. § 7607(d)(7)(B) (only an objection to a rule that was raised with reasonable specificity during the period for public comment may be raised during judicial review). While one of the petitioners made a comment in connection with a proposed waiver for ethanol that was never enacted, that comment was made during the comment period for a separate prior proposal and it did not raise the objection with reasonable specificity. Furthermore, because section 7545(k) required it to promulgate RFG requirements, EPA says that section 7545(c), which was not mentioned in subsection (k), cannot be read as imposing separate requirements for the RFG program.

## II. ANALYSIS

We must reverse EPA's decision to require renewable oxygenates in its final rule if it is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law. *See Motor Vehicle Mfrs. Ass'n of the United States, Inc. v. EPA,* 768 F.2d 385, 389 n. 6 (D.C.Cir.1985), *cert. denied,* 474 U.S. 1082, 106 S.Ct. 852, 88 L.Ed.2d 892 (1986). Also, under the CAA, agency action may be reversed by the court if it is not in accordance with law, 42 U.S.C. § 7607(d)(9)(A), or is in excess of statutory jurisdiction, authority, or limitations. 42 U.S.C. § 7607(d)(9)(C). To determine whether EPA's action is contrary to law, we must look to the CAA. *See, e.g., Natural Resources Defense Council, Inc. v. Reilly,* 976 F.2d 36, 40 (D.C.Cir.1992). If, using the traditional tools of statutory interpretation, the meaning of section 7545(k)(1) is clear, then the court must give effect to that meaning. *Chevron,* 467 U.S. at 843 n. 9, 104 S.Ct. at 2782 n. 9. If the statute is ambiguous, the court must then defer to EPA's interpretation, as long as it is reasonable. *Id.* at 843–45, 104 S.Ct. at 2781–83.

■ We conclude that the plain meaning of section 7545(k)(1) precludes the adoption of RFG rules that are not directed toward the reduction of VOCs and toxics emissions, and, since the statute is unambiguous, EPA improperly interpreted the section as giving

it the broader power to adopt the ROR. *See Chevron,* 467 U.S. at 842–43, 104 S.Ct. at 2781–82; *Bowen v. Georgetown Univ. Hosp.,* 488 U.S. 204, 208, 109 S.Ct. 468, 471–72, 102 L.Ed.2d 493 (1988) ("It is axiomatic that an administrative agency's power to promulgate legislative regulations is limited to the authority delegated by Congress."). The sole purpose of the RFG program is to reduce air pollution, which it does through specific performance standards for reducing VOCs and toxics emissions. EPA admits that the ROR will not give additional emission reductions for VOCs or toxics, *see* 59 Fed.Reg. at 39,283, and has even conceded that use of ethanol might possibly make air quality worse. *Id.* at 39,268.

■ While EPA relies on the first sentence of section 7545(k)(1) for its broad authority to impose requirements for RFG that are "independent of and in addition to the obligation to require the greatest achievable VOC and toxics emissions reductions under the second sentence of Section [7545(k)(1)]," 58 Fed.Reg. at 68,351, neither that sentence alone nor in conjunction with the rest of the section grants EPA authority to require the use of oxygenates that will not reduce, and may increase, VOCs and toxics emissions. As the court found in *Sierra Club v. EPA,* 719 F.2d 436, 455 (D.C.Cir.1983), *cert. denied,* 468 U.S. 1204, 104 S.Ct. 3571, 82 L.Ed.2d 870 (1984), EPA cannot rely on its general authority to make rules necessary to carry out its functions when a specific statutory directive defines the relevant functions of EPA in a particular area. Also, in *Natural Resources Defense Council, Inc. v. Reilly,* 976 F.2d at 41, the court observed that the general grant of rulemaking power to EPA cannot trump specific portions of the CAA and that EPA cannot use the general rulemaking authority under section 7601(a)(1) as justification for adding new factors to a list of statutorily specified ones. *See also United States Nat'l Bank of Oregon v. Independent Ins. Agents of America, Inc.,* —— U.S. ——, ——, 113 S.Ct. 2173, 2182, 124 L.Ed.2d 402 (1993) (court must not be guided by a single sentence of a statute but must look to the provisions of the whole law and to its object and policy). Thus, EPA cannot uncouple the

first sentence of section 7545(k)(1) from the rest of the section in order to expand its authority beyond the aims and limits of the section as a whole.

■ In effect, EPA argues that because Congress has not explicitly limited its authority to promulgate a renewable oxygenate requirement, its interpretation of section 7545(k)(1) thus passes *Chevron*'s first step, and this court must then defer to its expansive interpretation of the section under *Chevron*'s second step. To suggest, however, "that *Chevron* step two is implicated any time a statute does not expressly *negate* the existence of a claimed administrative power (*i.e.* when the statute is not written in 'thou shalt not' terms), is both flatly unfaithful to the principles of administrative law ..., and refuted by precedent." *Railway Labor Executives' Ass'n v. National Mediation Bd.*, 29 F.3d 655, 671 (D.C.Cir.1994) (in banc), *cert. denied*, —— U.S. ——, 115 S.Ct. 1392, 131 L.Ed.2d 243 (1995). Thus, we will not presume a delegation of power based solely on the fact that there is not an express withholding of such power. *Ethyl Corp. v. EPA*, 51 F.3d 1053, 1060–61 (D.C.Cir.1995).

Section 7545(k)(1) authorizes the adoption of regulations to achieve the greatest reduction in emissions of VOCs and toxics and the consideration of nonair-quality factors listed in the section is only to ensure that any emission reduction steps do not have inordinate economic, environmental, or energy effects. The overriding goal is air quality, and the other listed considerations are subordinate to that goal. Once EPA has taken the factors into consideration in the context of attaining the greatest reduction in VOCs and toxics emissions achievable, the statute does not authorize it to use these factors as a basis for imposing any additional restrictions on RFG, even if the additional restrictions would yield some benefit among the factors to be taken into consideration. Accordingly, since EPA must consider factors such as "energy requirements" only as subordinate concerns to clear goals of the RFG program, it lacks the authority to promulgate the ROR, which advances the use of renewable oxygenates not in furtherance of, and perhaps at the expense of, reductions in VOCs and toxics emissions.

■ Our conclusion is supported by 42 U.S.C. § 7545(c), which authorizes EPA to control or prohibit the manufacture or sale of fuels or fuel additives if the agency finds that such fuels or fuel additives cause or contribute to air pollution or impair the performance of emission control devices.[1] Before it can prohibit a fuel or fuel additive, EPA must do several things, including publish a finding that such prohibition will not cause the use of any other fuel or fuel additive which will produce emissions that will endanger the public health to the same or greater degree than use of the fuel or additive to be prohibited. 42 U.S.C. § 7545(c)(2)(C). In *American Methyl Corp. v. EPA*, 749 F.2d at 834–36, the court determined that EPA must comply with this section to ban or control a specific gasoline blend that is already in commerce. Moreover, in *Amoco Oil Co. v. EPA*, 501 F.2d 722, 744–46 (D.C.Cir.1974), the court considered an EPA regulation that required outlets whose sale of gasoline exceeded a certain volume to sell at least one grade of unleaded gasoline. The court concluded that this regulation was a control on the sale of *leaded* gasoline since it effectively precluded certain retailers from selling leaded gasoline unless they also sold unleaded gas. *Id.* at 744. Accordingly, the court found that EPA had the power to promulgate this regulation under section 7545(c) of the CAA. *Id.*

■ There is a clear parallel between *Amoco Oil Co.* and the instant case since the

1. EPA contends that judicial review of an objection to the ROR based on EPA's obligations under § 7545(c) is foreclosed because these objections were not raised before the agency in accordance with the requirements of § 7607(d)(7)(B). Although we consider the question a close one, we find that the objection was adequately raised before EPA. The ROR that EPA finally promulgated grew directly out of an abortive attempt to promulgate an ethanol waiver rule, meant to accomplish a substantially similar purpose. *See* 56 Fed.Reg. at 39,259. In that docket, one of the petitioners specifically raised the objection in question. EPA considered the record developed in those earlier hearings to be directly relevant to the ROR, and thus incorporated the ethanol waiver docket in its entirety into the ROR record. *Id.* at 39,258. The question of EPA's obligations under § 7545(c) is thus properly before us.

ROR's mandate to use renewable oxygenates necessarily controls the use of nonrenewable oxygenates. This suggests that EPA's power to control a fuel or fuel additive already in commerce is controlled by section 7545(c) and that EPA does not have an independent source of authority to control or prohibit nonrenewable oxygenates springing from the considerations enumerated in section 7545(k)(1). Tellingly, in promulgating the regulations establishing the RFG program, EPA relied on section 7545(c) to impose an additional requirement on RFG that reduced oxides of nitrogen, which was directed at a reduction in ozone formation. 59 Fed.Reg. at 7,745. Finally, the authority to set a standard under the CAA does not authorize EPA to mandate the manner of compliance or the precise formula for compliance without additional explicit authority. *See Adamo Wrecking Co.,* 434 U.S. at 286–89, 98 S.Ct. at 573–75; *PPG Indus., Inc.,* 660 F.2d at 636.

In light of our conclusions above, we need not address petitioners' remaining arguments about the ROR.

## III. CONCLUSION

Based on the foregoing reasons, the court concludes that EPA lacked the authority to promulgate the ROR under section 7545(k)(1). Accordingly, the petition for review is hereby granted.